Isidore Levine, J.
The petitioner herein seeks support from the respondent for herself and three children of the parties hereto, based upon a ceremonial “ marriage ” entered into between the parties in Connecticut on September 23, 1954. On that day respondent’s “ prior ” wife, Marjorie, was alive, but mentally incompetent, in an institution.
However, prior to that date, and on August 24, 1954, respondent obtained a unilateral Mexican divorce from Marjorie. Accordingly, petitioner claims that her subsequent marriage to respondent on September 23, 1954 was a legal marriage.
Respondent contends that his unilateral Mexican divorce from Marjorie without her consent (since she was incompetent, she could give none) was a complete nullity, and hence his subsequent “ marriage ” to petitioner, while Marjorie was still alive, is a complete nullity.
Petitioner counters this argument by asserting that respondent is estopped from denying the validity of the Mexican divorce since it was he who procured it, and secondly, that she was misled by respondent into believing that his Mexican divorce was valid and effective in dissolving his prior marriage to Marjorie, so as to enable him to be legally married to petitioner.
Relevant on this issue are the precise facts surrounding the securing of the Mexican divorce. The undisputed testimony adduced at the trial reveals that respondent (in the company of petitioner) went to Mexico City, not for the purpose of residing there, where he consulted a lawyer and where he signed papers for a divorce, which were mailed to Juarez, where the divorce decree was issued shortly thereafter. Respondent never went to Juarez nor appeared in any court in Juarez. (It is significant to note that Mexico City is a great distance away from Juarez, and that Mexico City and Juarez are in different States in Mexico.) After signing the papers in Mexico City, respondent (with petitioner) returned shortly thereafter to New York where respondent resided and maintained his professional practice, and where he continues to reside and practice to the present day.
*1034 Several issues are now presented to the court.
1. Are the parties legally married because the respondent’s Mexican decree was valid, and, if not, is the respondent estopped from denying the validity of his Mexican divorce?
2. If the parties are not legally married, are the three children illegitimate, and, if so, does the Family Court have the power to declare the legitimacy of the children for the purpose of support and for other purposes?
3. If the petitioner is not the legal wife of the respondent, is she entitled to any support for herself, and, if not, what is the proper amount for the support of the three children alone?
4. If the petitioner is found not to be the legal wife of the respondent, is her attorney entitled to counsel fees for services rendered in this case for her alone, as separated from services rendered on behalf of the children, and, if not, what is the proper amount of counsel fees for services rendered to the three children only?
The court will endeavor to answer these questions in the order hereinabove presented.
1. After a thorough and painstaking review of the legal authorities and precedents for the knotty issues presented herein involving, amongst other things, the serious and vexatious question of estoppel against a jurisdictional attack on a foreign decree of divorce, the court concludes, based upon the law and the facts as found herein, that the parties hereto are not legally married, since at the time of their attempted marriage to each other on September 23, 1954, the respondent had a prior wife alive (Marjorie) between whom there was no legal divorce, since the Mexican divorce decree obtained by the respondent on August 24, 1954 against Marjorie was a complete nullity, and as such beyond the ability of the doctrine of estoppel to revive.
Decisive of the conclusion herein, albeit, a 4-to-3 decision, is the case of Rosenbaum v. Rosenbaum (309 N. Y. 371, 376) where the court held: “this Mexican divorce action — a clear legal nullity under the allegations of plaintiff’s complaint, and of no more validity than a so-called maAl-order divorce, from which we said 1 no rights of any kind may spring ’ (Caldwell v. Caldwell [298 N. Y. 146], 151) —is controlled by valid precedent in our court.” (Italics, the court’s.)
Again, in the Rosenbaum case (supra, p. 377) the court stated: “If, in fact, defendant obtains a Mexican divorce and thereupon enters into a subsequent marriage, plaintiff need have no *1035 fear for her property rights and marital status under New York law
In the Rosenbaum case (supra) the court was called upon to find as a fact (since the issue was presented to the court on respondent’s cross motion to dismiss plaintiff’s complaint for an injunction against respondent’s prosecution of his divorce action in Mexico) that defendant appeared in Mexico on November 5, 1954 solely for the purpose of signing divorce papers and not for the purpose of residing there, remaining at all times a resident and domiciliary of New York, wherein he continues to reside and practice his profession, and that he has been physically present here since November 7, 1954 (p. 374).
So, too, in the case at bar, the court finds on the evidence that the respondent was in Mexico City for the purpose of signing divorce papers, preparatory to securing a divorce decree, not in Mexico City, but in Juarez, Mexico, an entirely different city and State, thereby making- the divorce in the instant case, even more void, if such comparison be possible, than the divorce, which was attempted to be secured in the Rosenbaum case. In addition, the court finds as facts, based upon the evidence, that the respondent herein did not appear in Mexico for the purpose of residing there, and remained at all times a resident and domiciliary of New York State to which he returned promptly and where he continues to reside and practice his profession, and that he has been physically present since his return from Mexico, except for vacation or business trips.
Another case holding that the husband was not estopped from asserting as a defense to an action for separation, the invalidity of a Mexican decree divorcing him from his former wife, is the case of Alfaro v. Alfaro (7 N Y 2d 949), where the Court of Appeals unanimously affirmed the Appellate Division (5 A D 2d 770), which by a 3-to-2 vote had upheld the trial court, which found that the Mexican court which purported to grant respondent a divorce from his former wife, was without jurisdiction, where the court found that although the respondent journeyed to Mexico he did not appear in person in the Mexican court and in addition, that prior to the decree the appellant knew or was advised that the decree would be invalid in New York (see recitation of facts and court findings in the dissenting opinion in the Appellate Division, supra). So, too, in the case at bar, the court finds by the overwhelming and wholly credible evidence adduced at the trial that the petitioner herein knew and was advised that the respondent’s purported divorce decree *1036 from Ms former wife, Marjorie, would be and was invalid in New York.
In the instant case petitioner urges upon the court that respondent should be estopped from denying the invalidity of his Mexican divorce from Marjorie, and cites in support of her position the case of Krause v. Krause (282 N. Y. 355). However, the distinction between that case, involving a Nevada divorce, and the case at bar involving a Mexican divorce, is clearly stated in the case of Caldwell v. Caldwell (298 N. Y. 146) where the Court of Appeals unanimously stated at p. 149: “ We think that the rule of quasi-estoppel in the Krause ease (supra) is not applicable hére. * * * We held that the Nevada decree would not be recognized in this State and that the subsequent marriage to plaintiff by defendant was void because of his incapacity to enter into a valid marriage but that having himself procured the Nevada decree he would not be permitted to assert its invalidity so as to avoid an obligation to support ,the plaintiff wife whom he had married on the strength of his Nevada decree.”
In analyzing the rationale for permitting estoppel in sister State divorce decrees, while denying it in Mexican decrees, the Caldwell decision went on to state (p. 150):
< < — The procurer of the sister State divorce in order to attack it, must attempt to establish affirmatively in our courts that he succeeded in perpetrating a fraud upon the court of that sister State. To refuse to permit that is not unreasonable but is consonant with justice.”
“ The reason for that rule vanishes when we have presented to us a situation where two persons attempt to confer jurisdiction upon a court of a foreign nation by means of the execution of powers of attorney to counsel residing there * * *. This is the device which results in what we have come to denominate ‘ a mail-order divorce. ’ There is not even the slightest semblance or color of jurisdiction justifying action by a court. The spouses here never submitted themselves to nor invoked the jurisdiction of a court of the foreign nation as we understood those terms. They violated our statute embodying our public policy (Domestic Relations Law, § 51). Their collusive agreement and conduct may not be the foundation for the creation of any rights. This differs from the situation in the Krause case (282 N. Y. 355, supra). Here the defendant, assuming that he was the sole procurer of the divorce in Mexico, engaged in no deception of the court there and perpetrated no fraud upon it. He never alleged or claimed domicile in Mexico. He was never there. ’ ’
*1037 While the Mexican decree in the case at bar was not obtained by mail order in the same sense as in the Caldwell case (supra) the Rosenbaum, decision (supra) found a Mexican decree based upon physical appearance by the husband in Mexico for the purpose of signing divorce papers and not for the purpose of residing there (as in the case at bar) of equal nullity and of no more validity than' a mail-order decree.
See, also, Packer v. Packer (6 A D 2d 464, 467) where the Appellate Division of the First Department stated as follows: “ Not to be confused with the problems arising from divorces obtained in sister States of the federal union are the specious mail-order divorces obtained in foreign countries. With respect to such divorces the courts have made it clear that they do not have even sufficient vitality to create an estoppel against the spouse who obtains it in an action to establish marital status, although it may suffice to preclude the spouse from asserting a private claim or demand arising out of the marriage (Querze v. Querze, 290 N. Y. 13, 17-18: cf., Starbuck v. Starbuck, 173 N. Y. 503, involving a Massachusetts divorce but cited by the court in the Querse case for the proposition last discussed).” To the same effect see Fishberg v. Fishberg (16 A D 2d 629, 630) where the court stated: 1 ‘ The purported divorce of the defendant from his prior spouse was obtained in Mexico without the defendant ever acquiring a colorable residence there. Clearly, on the record here, such divorce was void ab initio and ineffective to dissolve the marriage; and the defendant is not to be estopped from asserting such basic validity. (Alfaro v. Alfaro, 7 N Y 2d 949, affg. 5 A D 2d 770: Marum v. Marum, 8 A D 2d 975; Heine v. Heine, 10 A D 2d 864.) * * * An existing valid marriage between the parties is a necessary condition for the .exercise by the Family Court of jurisdiction to direct payment by a man for support of his alleged wife. (N. Y. City Dom. Rel. Ct. Act, § 91.) In order to ascertain whether it possesses such jurisdiction, the Family Court is empowered to and should hear and determine the issue of a valid marriage. (Loomis v. Loomis, 288 N. Y. 222.) ”
Further, on this point the court would like to call attention to an excellent article by Homer Clark, Professor of Law at the University of Colorado, School of Law, entitled “ Estoppel Against Jurisdictional Attack on Decrees of Divorce ’ ’ which appeared in volume 70 of the Yale Law Journal at page 45, in which, after an exhaustive analysis of the seeming inconsistencies in the cases interpreting the doctrine of estoppel throughout the entire country, Professor Clark stated (p. 52): u At any rate, it now seems to be true in New York that estoppel will not *1038 preclude attack on a Mexican mail-order divorce, whether or not the claim involved can be described as 1 private.’ The case which established this is Caldwell v. Caldwell ”.
On the issue of whether the case at bar presents a ££ matrimonial ’ ’ action as distinguished from a ‘ ‘ private ’ ’ claim, assuming this distinction is part of our New York jurisprudence since referred to in the case of Querze v. Querze. (290 N. Y. 13) although such assumption was not necessary to the decision, the court therein held that the wife who sued her husband for divorce and alimony, although having obtained a Mexican mail-order divorce several years before, was not estopped to urge the invalidity of her prior divorce even though the husband had since remarried, since this was a ‘ ‘ matrimonial ’ ’ action, and that the claim for alimony did not transform it into a ‘ ‘ private ’ ’ claim.
Accordingly, even if the New York law drew a distinction between ‘ ‘ matrimonial ’ ’ actions and £ £ private ’ ’ claims, permitting the law of estoppel to apply in <£ private” claims, (Starbuck v. Starbuck, 173 N. Y. 503), (and dissenting opinion in Krause v. Krause, 282 N. Y. 355), but denying such right of estoppel in 1 £ matrimonial ’ ’ actions, the Querze case would be authority for the finding that the case at bar presents a ££ matrimonial ’ ’ suit as distinguished from a ‘1 private ’ ’ claim and hence, the doctrine of estoppel does not apply.
Finally, on the issue of estoppel, petitioner urges the cases of Zeitlan v. Zeitlan (31 A D 2d 955) and Frankiel v. Frankiel (23 A D 2d 770) as support for her position that estoppel may be grounded upon the claim that the husband fraudulently represented to petitioner that the Mexican decree obtained by him on August 24, 1954 was legally valid, in consequence of which the marriage of the parties hereto was valid, upon which false and fraudulent representations the petitioner has relied.
While the decisions of the Court of Appeals (Rosenbaum, Caldwell, Alfaro, Marum, etc., all supra) do not delineate such exception to the general rules of estoppel hereinabove discussed, the factual situation in the case at bar mandates a dismissal of a finding of estoppel, as did the facts in the Zeitlan case, even if we were to assume that the Zeitlan and Frankiel rationale enunciated by the Appellate Division of the Second Department, will be adopted by the Court of Appeals.
As heretofore stated in this decision, this court finds that there was no fraud and no misrepresentation by the respondent, and no reliance by petitioner with regard to the legal efficacy of respondent’s divorce from Marjorie. The evidence adduced *1039 at the trial from both petitioner and respondent, the affidavit of petitioner sworn to March 15,1954, the decision of Mr. Justice Edeb dated March 24, 1954, the testimony of Sidney Schreiberg, Esq., all overwhelmingly establish that petitioner was fully aware of the legal infirmity and invalidity of the respondent’s unilateral divorce from Marjorie on August 24, 1954, on which date petitioner knew that Marjorie was alive but incompetent and incapable of giving consent to respondent’s Mexican divorce from her.
2. Turning now to another issue in the case, namely the legitimacy or illegitimacy of the children, petitioner has urged throughout the trial that a finding of invalidity of the marriage between the parties hereto would result in bastardizing the children.
Petitioner’s position, however, is without merit in view of two statutes which govern the within situation, namely, section 417 of the Family Court Act, (covering the legitimacy of children for the purpose of support under said article) and section 145 of the Domestic Relations Law (covering legitimacy of children for all purposes).
Section 417 of the Family Court Act expressly provides: “ A child born of parents who at any time prior or subsequent to the birth of said child shall have entered into a ceremonial marriage shall be deemed the legitimate child of both parents for all purposes of this article regardless of the validity of such marriage.”
Since it is conceded by both parties that they entered into a ceremonial marriage in Connecticut on September 23, 1954, the children are deemed legitimate for the purpose of support under this article.
See, also, section 24 of the Domestic Relations Law, effective April 30, 1969, which superseded section 145 of the Domestic Relations Law; this new section now provides as follows: “ § 24. Effect of marriage on legitimacy of children. 1. A child heretofore or hereafter born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage, or shall have consummated a common-law marriage where such marriage is recognized as valid, in the manner authorized by the law of the place where such marriage takes place, is the legitimate child of both natural parents notwithstanding that such marriage is void or voidable or has been or shall hereafter be annulled or judicially declared void. ’ ’
Accordingly, under and pursuant to the authority granted by such sections of the Domestic Relations Law, the court does *1040 hereby decide that Robert T. Lamb*, Alice J. Lamb*, and Theodore F. Lamb* are the legitimate children of Dolores Lamb* and Charles Lamb* in all respects and without limitations.
Should there be any question with regard to the power of the Family Court to make such declaration of legitimacy under the Domestic Relations Law, see Matter of Lentz (247 App. Div. 31) where the court held that subdivision 2 of section 6 of the Children’s Court Act, determining the liability of a father and husband to support a child, authorized the court to determine the question of the legal relationship of the children to the father.
See, also, Matter of Newins (16 A D 2d 436) wherein the Appellate Division expressly stated that it was within the power of other courts to declare children legitimate ‘ ‘ in accordance with the legislative detailed plan of legitimization expressed in the statute.”
3. Having thus disposed of the issue of legitimacy of the children, we now pass on to a question of the appropriate amount for their support in the light of their needs and their current standard of living, and the respondent’s ability to pay.
It might be appropriate at this time, before proceeding further on the issue of support for the children, to lay at rest a question raised by petitioner, with regard to the power of the Family Court to declare the validity or invalidity of a marriage, which the court has hereinbefore declared to be invalid, in consequence of which it proposes to make no order for the support of the petitioner herein.
Attention is, therefore, called to the case of Fishberg v. Fishberg (16 A D 2d 629) where the court stated: “ An existing valid marriage between the parties is a necessary condition for the exercise by the Family Court of jurisdiction to direct payment by a man for support of his alleged wife. * * * In order to ascertain whether it possesses such jurisdiction, the Family Court is empowered to and should hear and determine the issue of a valid marriage. (Loomis v. Loomis, 288 N. Y. 222.) ”
In determining the appropriate amount for the support of the three children, the court has been aided significantly by the very skillful and revealing presentation by respondent’s counsel of the tax impact upon respondent’s earnings, even if they were maintained at the 1967 level, and without consideration of an estimated $10,000 reduction in gross income for 1968, his *1041 present loss of his $30,000' teaching* position, as well as his impaired earning* capacity resulting from his diminished visual ability which was clearly demonstrated at the trial.
A reconstruction of respondent’s 1967 Federal tax return as a single person, with three dependent children, reveals a net earning of $23,833. Respondent’s offer of $10,000 per year for support of the three children is well reasoned, but overlooks one facet of the children’s needs, namely, the increased rent of petitioner’s apartment which must include bedrooms for the children as well as petitioner. On the entire financial picture based upon the respondent’s net income of $23,833 after taxes and after adding* back personal exemptions, and the needs of the three children, as well as their prior standard of living, the court fixes support for the three children at $12,000 per year payable in equal monthly installments of $1,000 per month directly to petitioner, commencing January 1, 1970. Should the parties desire to have these payments made weekly, they may prorate the monthly payment to a weekly payment, with the first weekly payment due on January 1, 1970.
In addition, the respondent has offered, and the court so orders, that he provide all necessary medical and therapy care for the children (the respondent being a psychiatrist) and that, as further suggested by respondent, if the children or any one or more of them, continue in the Dalton School or other private school, that securities in custodian accounts voluntarily opened by the respondent for each of the children, presently in the sum of approximately $20,000 for each child, be utilized for the payment of such tuition fees.
4. Turning now to the final issue, namely, counsel fee for petitioner’s attorney, it is necessary to examine the history and exact language of section 438 of the Family Court Act, as amended and effective May 21, 1968, which provides as follows: “ § 438 Counsel Fees. In any proceeding under this article by a wife or former wife, against her husband, or former husband, including proceedings for herself and her children, or by a person on behalf of children only * * * the court may allow counsel fees at any stage of the proceeding, to the attorney representing* the wife, former wife or person on behalf of children.”
Respondent urges that since petitioner is not the lawful wife or former wife of respondent, petitioner’s attorney is not entitled to counsel fees for services rendered to the petitioner, as distinguished from services rendered on behalf of the children.
*1042 While the court has not found any case directly in point, the court does find logic in the argument presented based upon the history of section 438 of the Family Court Act, as developed by somewhat similar cases.
In Groothoff v. Groothoff (50 Misc 2d 648) an application for counsel fees was made in 1966 at a time when section 438 did not contain the words “ or former wife ”. These words were added by amendment on May 21, 1968. Judge M. Miohael Potokeb, of this court, in denying the request for counsel fee, held that since the statute did not then have the words “ or former wife ’ ’, this court did not have authority to allow counsel fees to a former wife in an action instituted for herself. Judge Potokeb stated: “ The section has not, however, been amended to cover the allowance of counsel fees in support actions instituted by a divorced wife for herself nor has the Court of Appeals extended the Gordon rule to make that possible. ’ ’
Since the obligation of counsel fees on the part of a husband arises out of the husband-wife relationship, to support his wife with the necessaries of life (see Grossman, New York Law of Domestic Relations, § 342), it would follow that legal fees for a wife would not be a necessary to one who was not in fact a wife — as herein found by this court.
The only possible authority, therefore, for payment of the legal fees to petitioner’s attorney would be by statute, which is section 438 of the Family 'Court Act. However, this statute, like other statutes, absent liberalization provisions therein, must be strictly construed. Since the statute does not specifically provide counsel fees for a petitioner whose marriage has been declared invalid by the court, no such counsel fee may be awarded for services rendered to the petitioner per se as distinguished from services rendered for the children.
Since the major part of the trial herein was consumed in determining the validity or invalidity of the petitioner’s marriage to the respondent, the court cannot allow counsel fee for the time consumed in this area, notwithstanding the effort of petitioner’s attorney for which she seeks $9,250 plus $1,085 for her accountant.
Accordingly, based upon the time consumed in this litigation, which spanned over several months, the voluminous memoranda of law and affidavits submitted by both sides, covering many intricate questions of law, the hard-fought trial between two of the most respected and highly qualified members of the matrimonial bar, the court allows petitioner’s attorney the sum of $3,500, which the court finds the respondent is able to pay, which *1043 sum shall include disbursements and shall include any sum due the accountant for services rendered to the petitioner and petitioner’s attorney. The said sum of $3,500 shall be paid by respondent directly to petitioner’s attorney, as follows:
$1,500 on or before January 15, 1970
$1,000 on or before February 15,1970
$1,000 on or before March 15, 1970.
Visitation rights shall be as agreed upon by the parties, failing which either party may apply to the court to fix same.